JUSTICE NELSON,
concurring in part and dissenting in part.
¶94 Except as to the reversal and remand for a new trial on punitive damages (Opinion, ¶¶ 81-86 and 92), I concur in the Court’s Opinion, with one caveat.
¶95 I read ¶¶ 60-64 of the Opinion to hold that we are not rejecting, per se, a constitutional tort for violation of the fundamental right to a clean and healthful environment, Mont. Const, art. II, § 3, since here, having adopted Restatement (Second) of Torts § 929 and cmt. b (allowing restoration damages for injury to real property; see Opinion, ¶¶ 32-39), an award of damages for violation of Article II, Section 3, would be redundant. I concur in the Court’s Opinion on this limited basis, recognizing that a future case may present a factual and legal scenario that might well require us to address the constitutional tort theory on the merits.
¶96 As to the reversal and remand for a new trial on punitive damages, however, I dissent. The Court observes that punitive damages may be awarded under § 27-1-221, MCA, when a defendant has been found to have acted with actual fraud or actual malice and that the defendant’s state of mind “represents a key element in determining whether a defendant acted with actual fraud or actual malice.” Opinion, ¶ 81. The Court then reasons that evidence relating to DEQ’s involvement with the site remediation in the 1980s, 1990s, and 2000s and Texaco’s attempted compliance with CECRA would be “relevant to the issue of punitive damages,” Opinion, ¶ 83, and that the District Court, therefore, abused its discretion by excluding this evidence for purposes of considering the appropriateness of punitive damages, Opinion, ¶ 85.
¶97 I disagree with this reasoning for two reasons. First, the Court’s premise that the evidence at issue here was “relevant to the issue of punitive damages” is incorrect. That evidence was entirely irrelevant and, therefore, was properly excluded. M. R. Evid. 402. Second, even assuming, arguendo, that the evidence was relevant, it does not follow *289 that the evidence had to be admitted. To the contrary, the District Court had discretion under M. R. Evid. 403 to exclude the evidence, and I believe that the court did not abuse its discretion in doing so here. Accordingly, in my view, the Court errs in vacating the jury’s verdicts on punitive damages and remanding this case for a new trial on both liability for and the amount of such damages.
The Evidence at Issue was Irrelevant
¶98 In its first Special Verdict, the jury found Texaco “guilty of actual malice and/or actual fraud... with respect to [its] conduct in Sunburst so as to impose punitive damages,” and in its second Special Verdict, the jury set the amount of such damages at $25 million. Thereafter, the District Court reviewed the jury’s punitive damages award and entered findings of fact and conclusions of law pursuant to § 27-1-221(7)(c), MCA (stating that a jury’s award of punitive damages shall be reviewed by the court to determine whether the award should be increased or decreased, and instructing the court to state in findings of fact and conclusions of law the reasons for increasing, decreasing, or not increasing or decreasing the award).
¶99 In its findings of fact and conclusions of law, the District Court observed that “[Texaco’s] wrongdoing spans 50 years.” With respect to the period during which Texaco operated its refinery near Sunburst (1924 to 1961), the court found that
Texaco frequently allowed gasoline and other substances to spill and leak throughout the refinery grounds. . . . Texaco’s careless operations resulted in the migration of hundreds of thousands of gallons of gasoline into the town of Sunburst. . . . Texaco’s operations were conducted recklessly and maliciously, as those terms are defined by Montana law.
¶100 With respect to the period after Texaco had become aware of the contamination-which began at least as early as 1955, when escaping fumes from the underground plume caused a house in Sunburst to explode-the District Court found that “the pollution in Sunburst was ignored for a number of decades.” Then, in the late 1980s and early 1990s, Texaco began a new investigation of the environmental damage caused by its former refinery and learned that pollution from the refinery remained in the ground in Sunburst and on private property. The District Court found, however, that “[f]or the past 15 years” (i.e., from 1989 to 2004), Texaco “ha[s] engaged in a widespread pattern of deceitful and reprehensible conduct.”
*290 ¶101 The court cited several specific examples of such “deceitful and reprehensible conduct” on the part of Texaco during this period, including the following:
* Texaco “communicated with the public over the course of the last 15 years concerning its investigation [of the environmental damage caused by its former refinery]” but “consistently minimized the problem and failed to accurately report [its] findings.” The court found that Texaco had been “motivated by [its] own financial interests, rather than the interests of the plaintiffs and other members of the community” and that Texaco had “endeavored to save money with full knowledge that the plaintiffs and their property would be harmed as a result.”
* Texaco “made numerous affirmative misrepresentations concerning the pollution in Sunburst” and “mischaracterized data for the purpose of avoiding the expense of meaningful cleanup.” As an example, the court cited a newsletter distributed to Sunburst residents in 2001 which “mischaracterized data gathered from two different wells.” Although Texaco acknowledged this mischaracterization and claimed it was an honest mistake, the court noted that “the evidence revealed too many ‘mistakes’ on the part of [Texaco], and on each occasion, the ‘mistake’ would portray conditions favorable to [Texaco].”
* Texaco “advised the public, and even maintained at trial, that nature would cleanup the pollution in Sunburst.” Yet, Texaco’s representatives admitted at trial that “several of the necessary criteria for application of natural attenuation were not present” and that “natural attenuation might not work for more than 100 years, if at all.” Significantly, the court observed that “substantial evidence established that [Texaco’s] proposal to use natural attenuation was not scientifically supportable.” “Viewing the evidence as a whole,” the court found that Texaco had “recommended a cleanup method which will not work for the express purpose of saving money.” The court also found that Texaco had “misrepresented facts and utilized unsupportable scientific methods to further that objective, while disregarding the resulting harm to the plaintiffs, the community of Sunburst, and the environment.”
¶102 Summing up Texaco’s intent in committing the wrongdoing to which the punitive damages award was directed, the court observed as follows:
*291 [Texaco] knew many of the plaintiffs’ properties were polluted by carcinogenic compounds. Nonetheless, [Texaco] attempted to sweep the problem under the rug to avoid the financial burden of a cleanup and realize a savings of millions of dollars. [Texaco] took advantage of [its] superior technical knowledge to mislead an entire community which had placed a great deal of trust in [Texaco] to do the right thing.
¶103 In light of these findings by the District Court, Texaco’s state of mind during the 1980s, 1990s, and 2000s clearly informed the determinations of its liability for and the amount of punitive damages in this case.[1] Texaco complains on appeal, therefore, that it should have been allowed to present evidence relating to DEQ’s involvement with the site remediation-e.g., evidence “that [Texaco’s] actions were in full compliance with DEQ’s directions” and “that [Texaco] had been trying to repair any harm by cooperating with DEQ.” Texaco is mistaken.
¶104 The evidence of DEQ’s involvement with the site remediation in the 1980s, 1990s, and 2000s was not relevant to Texaco’s state of mind during that period. At the pretrial hearing on the parties’ motions in limine, counsel for Texaco explained one of the purposes of this evidence, as follows:
[T]he role of the DEQ is absolutely critical to the plaintiffs’ theories about punitive damages. We heard at great length from [counsel for plaintiffs] earlier this morning that Texaco switched the wells, that we omitted data from one well, that we provided a biased analysis. The consumer of this information in large measure was the DEQ. Whether the DEQ feels it was misled or lied to or somehow duped by Texaco, of course, is very critical to Texaco’s defense in this case.
This argument is patently without merit. DEQ was not a plaintiff in this case, and so evidence of whether DEQ “felt” it had been “misled or lied to or somehow duped by Texaco” was wholly irrelevant.
¶105 A second and similar purpose of the proffered evidence was explained as follows:
*292 [COUNSEL FOR TEXACO]: . . . [T]he plaintiffs want to cast this case as Texaco of its own volition trying to manipulate the data and trying to mislead the public and conducting a biased investigation.
THE COURT: Or at least control the data.
[COUNSEL FOR TEXACO]: True. And again, if it’s going to come down to their word against Texaco’s word, it’s relevant to have a third party, which has been intimately involved in this process, give its views about Texaco’s conduct.
Again, on the question of whether Texaco was guilty of actual fraud or actual malice in relation to plaintiffs, DEQ’s views about Texaco’s conduct in relation to DEQ were wholly irrelevant; and there is absolutely no basis in the record for concluding that DEQ’s representatives were competent (in the legal sense[2]) to testify as to Texaco’s conduct in relation to plaintiffs. Moreover, it was the jury^-not DEQ’s-responsibility to weigh “[plaintiffs’] word against Texaco’s word” and decide whom to believe. Texaco, apparently anticipating a favorable assessment by DEQ’s representatives, would have had the jury simply defer to DEQ’s views on this matter. The District Court properly rejected Texaco’s effort.
¶106 It appears that a third purpose of the proffered evidence was to shift blame for plaintiffs’ injuries from Texaco to DEQ. Counsel for Texaco explained that “the subsurface investigation and the feasibility study, as with all the other work that has been done out in Sunburst by Texaco and its consultants, it has been done under the supervision and guidance of the DEQ.” Counsel went so far as to assert that “Texaco cannot just act on its own” and that “Texaco is constrained by [the 1989 consent decree] and by what the DEQ wishes it to do out there.” Similarly, Texaco argues on appeal that “[u]nder the terms of the Consent Order, DEQ set ‘clean-up objectives, clean-up standards, and assessments of health and environmental risks.’ [Citation to Consent Order.] Texaco should have been allowed to show that DEQ could and did change Texaco’s work plans.”
¶107 As the District Court pointed out, however: “[W]hat I could see happening here is that [Texaco] might be wrapping [itself] in the cloak of DEQ .... Or taking it in a different direction, saying we’re blameless. We’re just doing what DEQ told us to do.” The court noted *293 that this strategy “almost approaches the empty chair defense,” an apt characterization with which I agree.
¶108 Moreover, governmental agency regulations and orders afford neither an explanation nor an excuse for egregious conduct on the part of a defendant. In this regard, the Court asserts that “[a] good-faith effort to comply with all government regulations ‘would be evidence of conduct inconsistent with the mental state requisite for punitive damages.’ ” Opinion, ¶ 81 (quoting Silkwood v. Kerr-McGee Corp., 485 F. Supp. 566, 584 (W.D. Okla. 1979)). Actually, what the Silkwood court said was: “Good faith belief in, and efforts to comply with, all government regulations would be evidence of conduct inconsistent with the mental state requisite for punitive damages.” Silkwood, 485 F. Supp. at 584 (emphasis added). This distinction is important, because “[a] good-faith effort to comply with all government regulations,” Opinion, ¶ 81-as opposed to “[g]ood faith belief in, and efforts to comply with, all government regulations,” Silkwood, 485 F. Supp. at 584-is not relevant evidence of a defendant’s state of mind for purposes of determining the appropriateness of punitive damages. ¶109 In Silkwood, the court explained that it is the character of the defendant’s conduct and the state of the defendant’s mind which control the propriety of punitive damages, not merely whether that conduct complies or fails to comply with a government regulation:
For the same reason that mere compliance with government regulations cannot necessarily be found consistent with the reasonable person standard, so too it cannot necessarily be found consistent with an attitude and conduct devoid of that state of mind for which an award of punitive damages is appropriate.
As in the drug and aviation cases noted above, a manufacturer may be found to have duties in addition to or different from those prescribed by regulation. A mere failure to act as a reasonable person in conformity with that duty would constitute negligence. A knowing and intentional disregard of that duty might under some circumstances constitute the gross recklessness and indifference to the safety of others that render punitive damages appropriate.
No one could argue, for example, that a manufacturer who knew that its drug would cause blindness would not be responsible for punitive damages for knowingly marketing that product for profit, even though the drug had been approved for distribution and marketing after compliance with all FDA regulations. Similarly, no one would question the propriety of *294 punitive damages assessed against an airplane manufacturer who, for example, knew that its plane was defectively designed and could crash during flight, notwithstanding that the manufacturer had complied with all government regulations and obtained an FAA certificate for the craft as airworthy.
Similarly, Kerr-McGee’s argument that compliance with regulations would still permit the escape of small quantities of plutonium overlooks the circumstances where punitive damages might be appropriate for damages caused through that escape. Surely defendants would not argue that punitive damages would be inappropriate if a nuclear licensee knew of the time and manner of the plutonium’s escape, but did nothing to prevent it because the regulations did not require it. Similarly, if a licensee were aware of defects within its facility that would render likely repeated exposures of employees to plutomum, but did nothing to correct it, as some evidence in this case indicated, punitive damages might be considered, regardless whether government regulations required those changes to be made. The character of the conduct and the state of the actor’s mind control the propriety of punitive damages, and not merely whether that conduct complies or fails to comply with a government regulation.
Silkwood, 485 F. Supp. at 583-84 (emphasis added, citations omitted). ¶110 Likewise, in the case at hand, if Texaco proceeded with a particular course of action that it knew created a high probability of injury to plaintiffs, § 27-1-221(2), MCA, then it cannot escape liability for punitive damages simply because DEQ approved that course of action. More to the point, DEQ’s having approved a course of action could never, in the context of punitive damages, be an explanation for “why [Texaco] acted as it did, or failed to act, whatever the case may be,” Opinion ¶ 84, because, for one thing, Texaco’s duties to plaintiffs in this case are defined by common law, not DEQ or CECRA, and, more importantly, a DEQ order is never a valid reason for deliberately proceeding to act in conscious or intentional disregard of, or with indifference to, the high probability of injury to plaintiffs, § 27-1-221(2)(a)-(b), MCA, for making representations with knowledge of their falsity, § 27-l-221(3)(a), MCA, or for concealing material facts with the purpose of depriving plaintiffs of property or legal rights or otherwise causing injury, § 27-l-221(3)(b), MCA. Simply put, Texaco cannot explain why it engaged in egregious conduct by pointing out that DEQ approved-or even directed-that conduct.
*295 ¶111 Notably, Texaco in fact conceded this point in response to questioning by the District Court:
THE COURT: Would Texaco do something if they thought DEQ was wrong? I mean—
[COUNSEL FOR TEXACO]: Yes. We can exhaust all-
THE COURT: If you had let DEQ lead you down the garden path and say, do this, do that, you would go through the process, the administrative process and appeal their mandates, I’m sure.
[COUNSEL FOR TEXACO]: Yes.
Indeed, if Texaco had reason to believe that DEQ’s mandates would create a high probability of injury to plaintiffs, then Texaco’s proper course of action was to appeal those mandates, not to implement them and then attempt after the fact to justify having done so by shifting the blame to DEQ.
¶112 For these reasons, I conclude that the proffered evidence of Texaco’s compliance with DEQ’s directions and with CECRA was not relevant on the issue of punitive damages.
Even if the Evidence at Issue was Relevant, the District Court did not Abuse its Discretion in Excluding Tt
¶113 Even assuming, arguendo, that the proffered evidence was probative of Texaco’s state of mind during the 1980s, 1990s, and 2000s, Texaco’s claim that it should have been allowed to present the evidence is mistaken for a second reason.
¶114 Evidence is not necessarily admissible simply because it is relevant. Indeed, M. R. Evid. 403 specifically states that
[ajlthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence [emphasis added].
For this reason, the Court’s assertion in ¶ 84 that “[a] district comb may not categorically exclude . . . evidence tending to show why the defendant acted as it did, or failed to act, whatever the case may be, when a jury considers whether to award punitive damages” is flat wrong. To the contrary, such evidence “may” be excluded pursuant to Rule 403; and the question here, therefore, is whether the District Court erred in its determination that the probative value of evidence relating to DEQ’s involvement with the site remediation in the 1980s, 1990s, and 2000s and Texaco’s attempted compliance with CECRA was substantially outweighed by any of the Rule 403 considerations.
*296 ¶115 In this regard, when reviewing a district court’s evidentiary rulings, we do not determine whether this Court would have made the same ruling. Rather, we determine whether the district court abused its discretion. Seltzer v. Morton, 2007 MT 62, ¶ 65, 336 Mont. 225, ¶ 65, 154 P.3d 561, ¶ 65 (citing Lopez v. Josephson, 2001 MT 133, ¶ 14, 305 Mont. 446, ¶ 14, 30 P.3d 326, ¶ 14). To prevail on a claim that the district court abused its discretion, “the appellant must demonstrate that ‘the district court acted arbitrarily without conscientious judgment or exceeded the bounds of reason.’ ” Seltzer, ¶ 65 (quoting Lopez, ¶ 14). Here, while Texaco dedicates a significant portion of its opening brief to explaining why the DEQ- and CECRA-related evidence would have provided crucial insight into Texaco’s state of mind during the 1980s, 1990s, and 2000s, Texaco fails to demonstrate how the District Court “acted arbitrarily without conscientious judgment” or “exceeded the bounds of reason” when it excluded that evidence.
¶116 And a similar paucity of analysis afflicts the Court’s Opinion. The Court opines that the excluded evidence “bears on whether Texaco acted with ‘deliberate indifference,’ whether Texaco knowingly concealed any material facts, and the size of any appropriate punitive award.” Opinion, ¶ 84. If true, however, this merely establishes that the evidence is relevant, not that the District Court “acted arbitrarily without conscientious judgment” or “exceeded the bounds of reason” when it excluded the evidence.
¶117 Indeed, it is unclear from the Court’s Opinion how the District Court abused its discretion. Perhaps the District Court’s error was in “disabling Texaco from explaining itself.” Opinion, ¶ 84. Yet, by its own admission, Texaco sought to present the excluded evidence so that the jury would know “[wjhether the DEQ feels it was misled or lied to or somehow duped by Texaco.” In addition, according to Texaco, “if it’s going to come down to [plaintiffs’] word against Texaco’s word, it’s relevant to have a third party, which has been intimately involved in this process, give its views about Texaco’s conduct.” These hardly constitute excluded “explanations” of Texaco’s misconduct; and I cannot agree that Texaco should have been permitted to place the blame for its misconduct on DEQ (the empty chair defense) by presenting evidence that “the subsurface investigation and the feasibility study, as with all the other work that has been done out in Sunburst by Texaco and its consultants, it has been done under the supervision and guidance of the DEQ.” Texaco’s misconduct was what *297 it was, and it cannot be justified or mitigated, after the fact, by shifting blame to DEQ.
¶118 Arguably, Texaco’s compliance and cooperation with DEQ’s directions does explain its conduct during the 1980s, 1990s, and 2000s to an extent. But evidence of that compliance and cooperation does not bear on the specific questions before the jury: whether Texaco acted in conscious or intentional disregard of, or with indifference to, the high probability of injury to plaintiffs, § 27-l-221(2)(a)-(b), MCA, whether Texaco made representations with knowledge of their falsity, § 27-1-221(3)(a), MCA, and whether Texaco concealed material facts with the purpose of depriving plaintiffs of property or legal rights or otherwise causing injury, § 27-l-221(3)(b), MCA. As such, as explained above, the evidence has no probative value in determining liability for and the amount of punitive damages.
¶119 Moreover, such evidence is properly excluded in a case such as this, where there is a very real danger that the evidence will confuse the issues and mislead the jury. Texaco’s interactions with DEQ spanned only fifteen of the fifty years at issue in this case. Therefore, there are thirty-five years of conduct by Texaco before DEQ came onto the scene for the jury to evaluate. This bifurcation of timeframes by itself renders the late interjection of DEQ difficult for the jury to incorporate into the punitive damages analysis.
¶120 Furthermore, as discussed above, a DEQ order is never a valid reason for deliberately proceeding to act in conscious or intentional disregard of, or with indifference to, the high probability of injury to plaintiffs, for making representations with knowledge of their falsity, or for concealing material facts with the purpose of depriving plaintiffs of property or legal rights or otherwise causing injury. Unfortunately, however, a jury could be led to conclude that because Texaco’s conduct was apparently sanctioned by the State, Texaco cannot be held responsible for that conduct or Texaco cannot be guilty of actual fraud or actual malice.
¶121 The high danger of confusing the issues, misleading the jury, and wasting time was one of the specific rationales relied on by the District Court. In its order granting plaintiffs’ motion to exclude the DEQ- and CECRA-related evidence, the court observed that allowing such evidence “would unnecessarily lengthen the trial and cause undue confusion.” And in its order denying Texaco’s motions for new trial and for judgment as a matter of law, the court reiterated its view that
*298 by offering evidence concerning the [DEQ] in its decisions, [Texaco] sought to cloak [itself] in the authority of the State of Montana. The State of Montana was not a party to this case, and its conduct was not at issue. The Court allowed Texaco to defend its own actions without shifting responsibility to an unnamed party.
¶122 Indeed, there is no merit to Texaco’s claim on appeal that “The Trial Was Not Fair” because of what Texaco perceives as “the one-sided nature of the evidence permitted at trial.” In my view, the District Court’s decision to exclude the DEQ- and CECRA-related evidence was abundantly prudent and amply supported by the record. The probative value of that evidence-to the extent there was any probative value-was substantially outweighed by the high likelihood of confusing the issues, misleading the jury, and wasting time. M. R. Evid. 403.
Conclusion
¶123 In sum, the Court concludes that Texaco’s state of mind in the 1980s, 1990s, and 2000s might be explained away or mitigated by its interactions with DEQ during that period. The Court is incorrect. The questions before the jury on the issue of Texaco’s liability for punitive damages were whether Texaco, during and after it operated its refinery, acted in conscious or intentional disregard of, or with indifference to, the high probability of injury to plaintiffs, made representations with knowledge of their falsity, or concealed material facts with the purpose of depriving plaintiffs of property or legal rights or otherwise causing injury. Section 27-l-221(2)-(3), MCA. Evidence that Texaco complied and cooperated with DEQ’s mandates has no probative value in deciding these questions and, thus, was properly excluded as irrelevant. M. R. Evid. 402.
¶124 Furthermore, even assuming, arguendo, that this evidence was relevant, the District Court had discretion to exclude it nonetheless pursuant to M. R. Evid. 403. We review a district court’s discretionary rulings for abuse of discretion, asking whether the court acted arbitrarily without conscientious judgment or exceeded the bounds of reason. On the record before us, the District Court clearly did not act arbitrarily without conscientious judgment. To the contrary, the court’s dialogue with counsel for each party during the hearing on plaintiffs’ motion to exclude the DEQ- and CECRA-related evidence demonstrates that the court put substantial thought into this issue, and there is nothing in the court’s stated reasons for granting the motion to indicate that the court’s ruling was founded on prejudice or preference, as opposed to the law. Likewise, the court’s ruling was well *299 within the bounds of reason, given the danger that Texaco’s proffered evidence of its interactions with DEQ would confuse the issues and mislead the jury in its consideration of the appropriateness of punitive damages. Accordingly, there is no basis for concluding that the District Court abused its discretion, for vacating the jury’s verdicts on punitive damages, and for remanding this case for a new trial.
¶125 The unfortunate consequence of the Court’s decision today will be senseless expenditures of time and money on the parts of the District Court, the litigants, and the jurors, who on remand must retry Texaco’s liability for punitive damages and, in a separate proceeding (see § 27-l-221(7)(a), MCA), redetermine the appropriate amount of such damages, taking into account what is plainly irrelevant evidence of Texaco’s compliance with government regulations and DEQ’s views about Texaco’s conduct.
¶126 After Texaco presents this evidence on remand, the jury must be instructed that the evidence is not dispositive of the question of whether Texaco is guilty of actual fraud or actual malice. Such evidence presents not a “danger,” but an inevitability of confusing the issues and misleading the jury. “The character of the conduct and the state of the actor’s mind control the propriety of punitive damages, and not merely whether that conduct complies or fails to comply with a government regulation.” Silkwood, 485 F. Supp. at 584. The jury must be so instructed.
¶127 In conclusion, except as to the reversal and remand for a new trial on punitive damages (Opinion, ¶¶ 81-86 and 92), from which I dissent, I otherwise concur in the Court’s Opinion-though, with respect to our discussion of the constitutional tort theory at ¶¶ 60-64, I concur on the limited basis stated in ¶ 95 above.
JUSTICE COTTER joins in the Concurrence and Dissent of JUSTICE NELSON.

 With respect to the amount of the award, the District Court stated that the jury’s determination that $25,000,000 was the appropriate amount of punitive damages was “supported by the evidence, as well as the factors this Court must consider in reviewing the award.” In addition, the court observed that “[a]s set forth above, [Texaco’s] conduct in this case was egregious, and the jury’s award was justified based on that conduct.”

 M. R. Evid. 602 states that “[a] witness may not testify as to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.”